Beecher PRIOR, Respondent,

v.

Rowena HAGER, Appellant.

No. 25093.

Kansas City Court of Appeals.

Missouri.

April 7, 1969.

J. F. Allebach, Albany, for appellant.

Beavers, Thomson & Beavers, Dick Thomson, Maryville, for respondent.

SHANGLER, Judge.

Beecher Prior, as plaintiff, brought his suit against Rowena Hager and her sons, Caryl E. Hager and Elbert Gene Hager, as defendants, upon the pleaded theory that he, Beecher Prior, as sole bodily heir of his mother, Sybil Prior, was entitled to the possession of and profits from the real estate (later described) under the Last Will and Testament of Henry W. B. Myrick, Sybil's father and plaintiff's grandfather. It should be understood that Sybil Prior and Rowena Hager were sisters. Rowena Hager, therefore, is plaintiff Beecher Prior's aunt, and Caryl E. Hager and Elbert Gene Hager are his cousins.

Although the petition recites a wrongful dispossession by defendants of the property since March 17, 1953 until February 11, 1964, with the attendant appropriation by defendants of the rents and profits therefrom, the proof presented was confined to the calendar years 1961, 1962 and 1963. Prior to trial plaintiff dismissed as to defendant Elbert Gene Hager. The trial was had to the court which found the issues in favor of plaintiff and against defendant Rowena Hager for $1,079.42 and against defendant Caryl Hager for $2,921.14. From the record, we are unable to understand the manner in which the sums taken in judgment against the respective defendants were derived. Only defendant Rowena Hager appeals from the judgment. In their briefs the parties refer to this action as one for an accounting. By whatever designation and by any permissible view of the pleadings and evidence disclosed by the record, the judgment against Rowena Hager may not stand in its present form.

No findings of fact or conclusions of law were requested, and none made. We have reviewed the case upon both the law and the evidence, as in suits of an equitable nature and have concurred in the contention of defendant Rowena Hager that, as to her, the evidence was not sufficient to support the judgment, which judgment was clearly erroneous. This is our independent conclusion after having given due regard for the trial court's opportunity to judge the credibility of the witnesses. V.A.M.R., Civil Rules, 73.01(d), 83.13(c).

The evidence itself is largely undisputed. Counsel contend, however, over what in-

ferences may be legitimately drawn from it, and the proper resolution of the issues presented rests upon that determination. Plaintiff Beecher Prior did not testify, and it does not appear from the record that he was in attendance at the trial. Defendant Rowena Hager and Caryl E. Hager, as parties adverse to plaintiff, were presented as witnesses for plaintiff. Sandra Johnson, Administrative and Price Report Clerk of the Agricultural Stabilization and Conservation (ASC) Program for Gentry County, Missouri, was called by plaintiff and was the only other witness presented at the trial. Defendants offered no evidence other than several documentary exhibits. We relate certain collateral events in order to lend coherence to the testimony within which it is framed.

Henry W. B. Myrick, father of Rowena Hager and of Sybil Prior (plaintiff's mother), died in 1937, having devised to Sybil Prior a life estate in the west one-half of an approximately 200 acre farm in Gentry County, Missouri. He devised to this other daughter, Rowena Hager, a life estate in the east one-half of the same farm. Sybil Prior died in 1953 and was survived by her only son, Beecher Prior. Defendant Caryl E. Hager, who can best be described as the family factotum, had operated both halves of the farm for some time before Sybil Prior's death in 1953 until February, 1963, when he was required to commence serving a three year term in the Missouri Penitentiary for defalcation of funds while serving as County Treasurer. In February, 1964, a receiver was appointed by the Circuit Court to operate the farm pendente lite. The receivership was incidental to a will contest suit brought by plaintiff and his daughter against numerous heirs and devisees of Mr. Myrick.

Defendant Caryl E. Hager, as previously stated, had operated the farm as a unit, working both the west half of it for some time before the death of Sybil Prior until the appointment of the receiver in 1964 and the east half, as well, for his mother, Rowena Hager. He kept separate account books for each half of the farm, but only one bank account.

Defendant Caryl E. Hager, more specifically, had commenced operating the west half of the farm some time in 1947 and, except for about a 2 or 3 year period, continued to do so until his penal commitment. Until Sybil Prior's death in 1953, he accounted to her for the profits and income from that property. Some time after her death, the ASC program was initiated in Gentry County and Caryl Hager made formal application for participation in the Agricultural Stabilization and Conservation Service, whereby certain monetary benefits would accrue for following certain conservation practices in the operation of the farm. He requested, and received, different designations for each half of the farm. The west (Prior) half, containing some 101.65 acres was listed as G 380; the east (Hager) half, containing some 94.82 acres was listed as G 320. "To simplify the matter of (his) own bookkeeping, (he) had it listed as owner and operator both, with the ASC office, owner and operator for record purposes only." The funds from this source for years 1961, 2 and 3 are the subject of this litigation. At this time (after Mrs. Prior's death in 1953), the farm was in need of many improvements and the money received from this program by Caryl Hager was used for its rehabilitation, and in so doing, he accounted to no one. He maintained detailed records of these operations but in July of 1967, while in Kansas City, they were stolen from his automobile, and although the theft was reported to the Kansas City, Missouri police, they were not recovered. Even without recourse to these records, he had a firm recollection that the "running balance" at the time he left (presumably for the penitentiary in 1963) was $232.50, which represented a summary of his total operations as to G 380, including as well what further sums were payable under ASC for the year 1963.

There was no expense, as such, incidental to participating in the ASC program, but without his records, he could not recall the gross income from that source.

He was urged by Mr. Ralph Ford, county chairman, to allow the ASC office to combine the two designations to facilitate record keeping but he felt members of the family might object, so he was obliged to refuse. Confusion resulted in the form of improper filings and erroneous numerical designations within the two files. Certain applications to participate in the various ASC programs were received as exhibits, as well as checks representing benefits received thereunder, but they will be treated separately as they might bear on Mr. Hager's testimony as well as that of the other witnesses.

Defendant Rowena Hager, mother of defendant Caryl Hager, left Gentry County after the death of her own mother about in the year 1952 and remained away until about 1963. She has but the sketchiest recollection of certain events which bear directly upon our full understanding of the total evidence. For instance, she did not recall who was in possession of the farm upon her return (and within the context of the questioning, it was not clear whether "farm" connoted the entire acreage or only the west or east portions severally). Although she admittedly executed a power of attorney (defendants' Exhibit 7) authorizing her son Caryl, among other things, to commit her land to the ASC programs, she did not recall where or when it was done. Nor did she recall whether she had authorized her son Caryl, by her power of attorney, to execute her endorsement on plaintiff's Exhibit 20, a check issued by the Commodity Credit Corporation under date of November 19, 1963, payable to the order of "Rowena Hager by Caryl Hager Pow. of Attn. Albany, Mo.", in the sum of $279.30 representing benefits derived from the west half under the ASC program. It can be fairly concluded that the only affirmative and material testimony given by this witness was that she had nothing to do with the west half of the farm (although even this innocuously self-serving assertion was disputed by some inconclusive testimony she had given in the will contest action), that she had never intended the power of attorney to be used with respect to land in which she had no interest, but that it was intended " * * * just to take care of my affairs." She admittedly endorsed a payment check derived from the west half in the amount of $163.29, plaintiff's Exhibit 26, for payment over to the First National Bank of Big Springs, Texas.

Sandra Johnson, Administrative and Price Report Clerk with the Gentry County Agricultural Conservation Program, helped prepare that office's records for the feed grain and wheat stabilization programs. She identified numerous exhibits relating to the G 380 and G 320 operations committed to the several programs. The procedure for enlistment in the conservation and stabilization programs was remarkably casual. It was accomplished merely by word from one that he either owned or operated a farm and if thereafter a change in status should occur, he was relied upon to inform that office. Although the owner's signature was required upon the Intention to Participate and Application for (Advance) Payment, it was not required upon the Application for Final Payment. Should a farmer have signed the owner's name, a power of attorney would be required, although the action of a farmer-operator in committing the owner to the programs was not usually questioned. The power of attorney executed by defendant Rowena Hager was by a form furnished by ASC and placed on file with that office. Mrs. Johnson could not say when the Hager power of attorney was filed. She acknowledged that nothing in her files indicated whether it was intended to refer to G 380, G 320 or to any other tract.

The numerous documentary exhibits received at the trial offer the most reliable source of information concerning

the material issues involved in this litigation. It would be tedious to describe each of them in detail; it is unnecessary to do so. Plaintiff's Exhibits 1 through 7 were various applications for years 1961, 2 and 3, for participation by the west half of the farm, G 380, in the various ASC conservation and stabilization programs, as well as for payment thereunder. Each of them, admittedly, was submitted by Caryl Hager, although some bore the designation of Rowena Hager as owner. In all other instances, Caryl was listed as both owner and operator. All were signed by Caryl's hand, and on those which designated Rowena as owner, her feigned signature was obviously executed by Caryl, and, as obviously, without any design to deceive. No explanation could be found why the designation of owner had been changed from Caryl to Rowena; nothing in the ASC files authorized it, nor was any request made to accomplish it. Neither could any witness explain how certain changes were wrought as to plaintiff's Exhibits 4, 6 and 7, and defendants' Exhibit 3, wherein certain printed designations as to owner and acreage variously, were changed by hand both as to G 380 and G 320.

Numerous checks totalling $3,216.00 representing benefits derived from the west farm (G 380) under the ASC programs, were made out to Caryl Hager as payee, and by him endorsed. (Plaintiff's Exhibits 11, 12, 13, 14, 17, 19, 21, 22, 23 and 24.) Three of such checks (Plaintiff's Exhibits 15, 16 and 18), totalling $266.76, were made payable to both Caryl and Rowena and endorsed in Caryl's hand. Three such others (Plaintiff's Exhibits 20, 25 and 26) made payable to Rowena and Caryl as her "power of attorney", totalling $517.81 were made payable by Rowena's endorsement to the First National Bank of Big Springs, Texas, although only one of these was endorsed by her own signature. It is on the basis of the deposit of these funds to her account and their presumptive retention by her that we predicate a judgment against Rowena Hager.

■ We have recounted the essential evidence. Very little of it is in conflict; much of it is inconclusive. We are enjoined by respondent to accord the trial court's findings that deference prescribed by Sec. 510.-310, V.A.M.S., 1959. However, where the oral evidence is largely undisputed and much of the total evidence consists of writings and documents, the same deference is not due the trial court as would otherwise be given in cases involving disputed oral testimony. Farm Bureau Mut. Ins. Co. v. Farmers Mut. Auto. Ins. Co., Mo.App., 360 S.W.2d 325; Adams v. Manchester Ins. & Ind. Co., Mo.App. 385 S.W.2d 359.

■ The only point raised by appellant Rowena Hager is that there was not sufficient evidence to support the judgment against her. Contrary to respondent's contention, such an assertion of error relating to a judgment in a court tried case may be raised for the first time in appellant's brief. Bogert Construction Company v. Lakebrink, Mo.App., 404 S.W.2d 779, V.A.M.R. Civil Rule 79.03. In any event, appellant had also specifically raised that point in her Motion for New Trial.

We surmise that the legal basis respondent offers as support for his judgment against Rowena Hager is that of an express agency created by the terms of the power of attorney, defendants' Exhibit 7. Respondent argues: The power of attorney executed by Rowena Hager "expressly gave Caryl E. Hager authority to act on behalf of the appellant in the enrollment of land in the various government agricultural programs. *If* such authority was in existence at the time Caryl E. Hager applied on behalf of appellant for participation in these programs, appellant would be charged with those acts and payment to the agent would be payment to the appellant". (Emphasis supplied.) We believe respondent begs the question because there was no evidence that the undated power of attorney was in existence at the time Caryl enrolled the land in the ASC programs. Furthermore,

there was no evidence that the power of attorney was intended by Rowena Hager to authorize Caryl to exercise it on her behalf as to any land in which she did not have an interest. Indeed, all of the evidence on that point was to the contrary,

The power of attorney, received as defendants' Exhibit 7, executed by Rowena Hager, was undated and unacknowledged. It recites execution in Albany, Missouri, although Mrs. Hager testified she did not remember where or when she signed it. Nowhere did the document designate to which land or farm it was intended to apply. The printed form itself was furnished by the ASC office and bore the official designation of the U. S. Department of Agriculture. Among its provisions were:

"KNOW ALL MEN BY THESE PRESENTS, that the undersigned does hereby make, constitute, and appoint Caryl E. Hager * * * the true and lawful attorney for and in the name, place, and stead of the undersigned in connection with the following agricultural programs, numbered all, under the jurisdiction of the United States Department of Agriculture, administered through ASC County Committees:

∨ 1.   All programs.
*   *   *   *   *   *
*   *   *   *   *   *

The undersigned gives and grants unto said attorney full authority and power to do and perform all and every act and thing whatsoever requisite and advisable to be done under such programs, including but not limited to, the selling and delivery of a commodity, the signing of an application, the borrowing of money, *the receiving of payments,* * * * and the making of reports, as fully to all intents and purposes as the undersigned might or could do if personally present, *hereby ratifying and confirming all that said attorney shall lawfully do or cause to be done by virtue hereof."* (Emphasis supplied.)

The relation of principal and agent is that legal relationship which exists "where one person, called the agent, is authorized—usually by the act of the parties, * * * to represent and act for another, called the principal, in the contractual dealings of the latter with third persons". When such authority is conferred by a formal instrument in writing it is said to be so conferred by "power of attorney". Mechem on Agency, Second Edition, Volume I, pages 17, 19. In order to be valid, a power of attorney must be sufficiently certain in its terms so that when the rules for the interpretation of written instruments are applied, the court is able to say what the parties intended. Ashley v. Bird, 1 Mo. 640, 14 Am.Dec. 313; Clark and Skyles on the Law of Agency, Volume I, page 107. Defendants' Exhibit 7, by its wording clearly manifests an intention to create the relationship of principal and agent between Rowena Hager and Caryl Hager. Its intended purposes were clearly specified as was its scope of application, which was quite broad. However, no specific mention is made of the land to which it was intended to apply. In this respect only, the instrument was ambiguous. "As in cases of other written instruments, there is no room for construction of a power of attorney which is not ambiguous or uncertain. * * * But in cases where construction of the instrument or interpretation of the language is necessary—that is, where the meaning of the instrument or the operative language therein is uncertain, obscure, or ambiguous —the first and foremost rule is that the intention of the parties as it existed at the time the power was granted is to be given effect * * *". 3 Am.Jur.2d, Agency, page 436, et seq. Rowena testified that she intended for the power of attorney to be exercised only as to land in which she had an interest. There is no evidence which bears on Caryl's intention at the time it was granted. The only land owned by Rowena subject to the ASC programs was the east half of the farm designated G 320, and the power of attorney was obviously intended to be exercised only as to that land.

■■■■■■■■■■■■■■■

Under the evidence, the instrument cannot be reasonably construed as having been intended by Rowena to commit the land comprising G 380 (the west half) to the ASC programs or to receive money due therefrom as a consequence. To conclude otherwise would require us to find that it was the intention of Rowena to commit an illegal or, at best, a tortious act and an appointment of an agent under such auspices would be illegal. The evidence does not support such a conclusion. Restatement of the Law Second, Agency 2d, Sec. 19. Furthermore, "Courts generally construe powers of attorney strictly and will not infer broad powers from instruments which do not sufficiently describe the property or subject with which the agent is to deal", Callwood v. Virgin Island Nat. Bank, (D.C., Virgin Islands), 121 F.Supp. 379, at page 392, citing Ashley v. Bird, supra. As otherwise stated, "The general rule is that the power (of attorney) must be pursued with legal strictness, and the agent can neither go beyond it nor beside it; in other words, the act done must be legally identical with that authorized to be done." Lamy v. Burr, 36 Mo. 85. Also 35 A.L.R. 467, discussing the application of the strict construction of authority under power of attorney to endorse commercial paper.

■■■■■■ If no actual authority as agent as to G 380 was expressly conferred upon Caryl Hager by the terms of the power of attorney, neither can an implied agency be raised under the circumstances. This is so because an implied agency is grounded on actual agency and is but a form of it, and is usually proved by circumstances attending the transaction to which it relates. It usually consists of those "incidental powers which naturally and ordinarily attend such an act, and which are reasonably necessary and proper to carry into effect the main power conferred and which are not known to be prohibited". Mechem on Agency, Second Edition, Book II, page 514. Also, 3 Am.Jur.2d, Agency, page 472; 2 C.J.S. Agency § 23, page 1045; Wyler Watch Agency v. Hooker, Mo.App., 280

S.W.2d 849. No evidence explained the manner in which Rowena Hager came to be designated as owner on some, but not all, of the documents relating to G 380 in conjunction with the ASC programs; or why it appeared on any at all. She did not authorize any of it. We may fairly conclude that Caryl was the prime mover in that regard, having submitted the documents under his own signatures despite the obvious G 380 designation thereon. It is equally as obvious that in so doing, Caryl was not prompted by any feigned authority derived from the power of attorney. There was no showing that Rowena knew of the designations G 380 and G 320 or to what, if anything they appertained. It should be recalled that whereas Caryl initiated the ASC program in 1953, Rowena was absent from that date until about 1963, so that all of those events and transactions which bear on our determination were concluded in her absence and without her knowledge. In the absence of an actual power conferred, no authority can be implied.

■■■■ Respondent does not contend for any theory of agency other than that of actual authority conferred under an express agreement of agency. We do not believe any can be plausibly argued. Yet, the evidence clearly established that Rowena Hager was the recipient of funds to which she had no legal right. The only check endorsed by Rowena Hager in her own hand was plaintiff's Exhibit 26, dated February 5, 1963, for $163.29. She made it payable to the order of the First National Bank of Big Springs, Texas. Upon being asked why that check alone was endorsed by Rowena, Caryl whimsically replied that because of his impending commitment to the penitentiary, "(He) mailed it to her for her signature and gave it to her and it was credited to her account, regardless of the fact that it was written as G-380." This answer was not challenged or further explained. Plaintiff's Exhibit 20, a check payable to "Rowena Hager by Caryl Hager Pow of Attn.", for $279.30 was endorsed in

that manner by Caryl and subsequently endorsed to the order of the First National Bank of Big Springs, Texas in Rowena's hand. There was no allusion to this latter fact in any of the testimony. Plaintiff's Exhibit 25, for $75.23, was also made payable to "Rowena Hager by Caryl E. Hager, Pow of Atty.", was endorsed by Caryl in that manner and subsequently endorsed to the order of the First National Bank of Big Springs, Texas in Rowena's hand. It can be reasonably concluded that in accepting the three checks, she believed them to have been derived from the ASC programs involving the east farm. The evidence considered in the aggregate does not establish Rowena's liability on a theory of ratification, and this despite her acceptance of some of the monetary benefits, as described, of Caryl's activities. There was no showing that she approved of his unauthorized conduct as it related to G 380 or that she even knew about it. Niehaus v. Mitchell, Mo.App., 417 S.W.2d 509; Fritsch v. National City Bank of St. Louis, Mo.App., 24 S.W.2d 1066.

Paragraph IV of plaintiff's petition alleged: "That said defendants during said period held the wrongful possession of said real estate taking the rents and profits therefrom in bad faith and did not believe themselves or any one of them entitled to possession of the west half of the real estate above described." Under such pleading, an action for money had and received may be maintained, as it alleges the receipt by defendant of money, or its equivalent, belonging to plaintiff which, in equity and good conscience, defendant should not be permitted to retain. Hilderbrand v. Anderson, Mo.App., 270 S.W.2d 406; Murray v. Murray, Mo.Sup., 293 S.W.2d 436; 58 C.J.S. Money Received § 1 et seq., page 906 et seq. The evidence supports a conclusion that defendant Rowena Hager was unjustly enriched in the sum of $517.81. In the absence of evidence to the contrary, and there was none, we will assume that those checks bearing her endorsement were in fact deposited at her direction to her account in the Texas bank, or to her use.

The judgment is reversed and the cause is remanded with directions that the trial court enter a judgment that plaintiff have and recover of defendant Rowena Hager the sum of $517.81 and for his costs.

All concur.